**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JULIE NACHAMPASSACK,<br><br>Plaintiff,<br><br>v.<br><br>ILLINOIS STATE TOLL HIGHWAY AUTHORITY,<br><br>Defendant. | No. 18-cv-00509<br>Judge Franklin U. Valderrama |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Julie Nachampassack (Nachampassack) was employed as a toll collector with defendant Illinois State Toll Highway Authority (the Tollway). Nachampassack filed this lawsuit against the Tollway, alleging discrimination and wrongful termination under the American with Disabilities Act (the ADA), retaliation and wrongful discharge under Title VII of the Civil Rights Act of 1964 (Title VII), and a hostile work environment under Title VII. R. 3, Compl.[1]

Before the Court is the Tollway's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. R. 64, MSJ. For the reasons stated below, the Court grants the Tollway's motion.

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

## Background[2]

The following undisputed facts are set forth as favorably to Nachampassack, the non-movant, as the record and Local Rule 56.1 permit. *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the Court assumes the truth of those facts, but does not vouch for them. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

### A. Nachampassack's Employment and the Tollway Structure

Nachampassack began working at the Tollway on November 18, 2002 as a Toll Collector, and was promoted to a Senior Toll Collector (together with Toll Collector, Collector) in 2012. Pl.'s Resp. DSOF ¶ 7.[3] Collectors collect tolls and keep track of collected tolls in manual toll lanes across the Tollway system and issue permits for overweight and over-dimension vehicles. *Id.* ¶ 8. They must be physically present in a toll plaza to perform these duties. *Id.*

For the purposes of collective bargaining, Collectors are represented by SEIU, Local 73 (the Union). Pl.'s Resp. DSOF ¶ 9. While Toll Collectors are not guaranteed a fixed schedule, Senior Toll Collectors are contractually guaranteed a fixed 40-hour per week schedule at a designated toll plaza(s) and also have priority in bidding on plaza assignments. *Id.*

---

[2]The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346(b).

[3]Citations to the parties' Local Rule 56.1 Statements of Material Facts are identified as follows: "DSOF" for the Tollway's Statement of Undisputed Facts (R. 66); "Pl.'s Resp. DSOF" for Nachampassack's Response to the Tollway's Statement of Undisputed Facts (R. 79); "PSOAF" for Nachampassack's Statement of Additional Facts (R. 78); and "Def.'s Resp. PSOAF" for the Tollway's Response to Nachampassack's Statement of Additional Facts (R. 84).

In 2016 and 2017, the Tollway required anywhere from 220 to 270 Collectors to work on a specific day. Pl.'s Resp. DSOF ¶ 11. On any given day during this time period, an average of approximately 25% of the Collectors were out on various types of leave such as vacation, sick days, the Family and Medical Leave Act (the FMLA), authorized leave without pay, or other leave provided by Tollway policy or contract. *Id.* ¶ 12.

The Tollway can fill in for employees who are on leave by using Temporary Replacement Toll Collectors (TRTCs). Pl.'s Resp. DSOF ¶ 14. In December 2016, the Tollway had eleven active TRTCs, and, in January 2017, it had five TRTCs because several TRTCs had been promoted to fill vacant Collector positions. *Id.* The number of active TRTCs has never been sufficient to fill in for all the Collectors who are absent on a specific day. *Id.* ¶ 15. Additionally, in 2016 and 2017, it routinely took up to six months from when a new Collector position opening was posted until a new Collector began working at a plaza. *Id.* ¶ 19.

From the date when she was promoted to a Senior Toll Collector to the end of her employment with the Tollway, Nachampassack worked exclusively at Plaza 1, which is located on Interstate 90 near South Beloit, four miles from the Illinois-Wisconsin Border. Pl.'s Resp. DSOF ¶ 17. Plaza 1 is one of the busiest plazas in the Tollway system, especially for manual tolls. *Id.* ¶ 18. The Tollway has difficulty managing absences at Plaza 1, since most of the Collectors work at plazas in the Chicago metropolitan area, and given Plaza's 1 location at the far end of the Tollway system, it is often difficult for the Tollway to find Collectors who are willing to fill

shifts at Plaza 1. DSOF, Exh. 10, Cataudella Decl., ¶ 16. When it can find a Collector to do so, the cost of travel pay and overtime is substantially greater than that at other plazas. *Id.*

Even though there is some seasonal fluctuation in the traffic amount at plazas, this does not significantly affect the staffing levels needed to maintain traffic flow, particularly at Plaza 1. Pl.'s Resp. DSOF ¶ 22. While the amount of passenger car traffic drops off outside of the summer, the level of truck traffic through the manual lanes is relatively constant during the year. To prevent lengthy backups as a result of this truck traffic, the Tollway tries to maintain relatively consistent staffing at Plaza 1 throughout the year. *Id.* During the summer, the Tollway employs Seasonal Toll Collectors not because of the higher volume of summer traffic, but as a result of many Collectors scheduling vacations during the summer. *Id.* ¶ 24. The Tollway's budget limits the number of Seasonal Toll Collectors and the period during which they are authorized to work. *Id.*

### B. Medical Leave Policies

Pursuant to the FMLA, the Tollway allows eligible Collectors to take up to twelve weeks of leave in a twelve-month period for the birth of a child, a serious health condition, or other purposes permitted by the FMLA. Pl.'s Resp. DSOF ¶ 25. The Tollway also allows Collectors to use available paid sick time and vacation time concurrently with any FMLA leave. *Id.* ¶ 26. The Tollway also provides Collectors with up to four to six weeks or Paid Parental Leave, and requires them to use sick time and Paid Parental Leave concurrently with FMLA leave. *Id.* Once Collectors

4

have exhausted these types of leave and any other available leave, Collectors can apply for Authorized Leave Without Pay (ALWOP). *Id.* ¶ 27. But ALWOP is only available if work requirements permit the Collectors' absence without "unreasonable disruption of work." *Id.* If the Tollway does not approve ALWOP, a Collector who is unable to return to work due to a disability can request additional leave under the ADA as a reasonable accommodation. *Id.* ¶ 28. To request this type of leave, a Collector submits a request to the Tollway's ADA Coordinator, who then engages in an interactive process with the Collector to determine if a reasonable accommodation is available and whether it can be provided without causing an "undue hardship" to the Tollway. *Id.*

### C. Harassment of Nachampassack

On or about August 8, 2015, Nachampassack told her supervisor, Plaza Manager Lesly Bunting (Bunting), that the Tollway's Chief of Operations, Jeffrey Redding (Redding), had harassed her. Pl.'s Resp. DSOF ¶ 30. Bunting immediately reported the matter to the Tollway's EEO Coordinator, Lisa Williams (Williams). *Id.* Two days later, Williams and Jennifer Bugaj (Bugaj), a Deputy Assistant Attorney General for the Tollway, interviewed Nachampassack. *Id.* ¶ 31. Nachampassack stated that she had engaged in a sexual relationship with Redding for years, and the relationship was initially consensual. But, according to Nachampassack, Redding then used his position to pressure her to continue the relationship against her wishes by subjecting her to unwarranted discipline and threatening the employment of her husband, who was also a Tollway employee. *Id.* The next day the Tollway terminated

Redding. *Id.* ¶ 32. The Tollway then promoted David Wilson (Wilson) to Chief of Operations to succeed Redding. *Id.* ¶ 33. Wilson knew Redding but did not consider him a friend. Wilson has not communicated with Redding since Redding's termination. *Id.*

Another Tollway employee, Lorrie Cataudella (Cataudella), was an Administrative Manager for Toll Operations and, since September 2015, has served as the General Manager, Toll Services. Pl.'s Resp. DSOF ¶ 34. As part of her roles, she oversaw all functions related to operation of plazas, including staffing, and, through supervisors, personnel at plazas. She reported to Redding when he was Chief of Operations, and then, after his termination, to Wilson. *Id.* Cataudella has not communicated with Redding since his termination. *Id.* ¶ 35. Cataudella considered Redding a work acquaintance, not a friend, DSOF ¶ 35, although Nachampassack points to evidence that Cataudella and Redding had a social relationship, Pl.'s Resp. DSOF ¶ 35.

The parties dispute whether Cataudella exhibited ill will towards Nachampassack. According to the Tollway, Cataudella "did not disagree" with the Tollway's decision to terminate Redding, did not bear any ill will toward Nachampassack for reporting Redding, and believed that Nachampassack did the right thing by reporting Redding. DSOF ¶ 36. Nachampassack, on the other hand, contends that when she asked Cataudella for help with Redding's harassment of Nachampassack, Cataudella "blatantly ignored it." Pl.'s Resp. DSOF ¶ 36. The Tollway admits that Nachampassack asked Cataudella to speak with her in private

in 2013, but disputes that Nachampassack indicated she wanted to discuss Redding's harassment or that Cataudella ignored Nachampassack's request. Def.'s Resp. PSOAF ¶ 13. Cataudella, as the FMLA Coordinator, requested that Nachampassack be recertified seven times in a twelve-month period for leave. Pl.'s Resp. DSOF ¶ 36. Cataudella also sent an email on October 14, 2016, in which she recommended commencing the "separation process" to terminate Nachampassack's employment. *Id.*

The parties dispute whether Cataudella or another employee recommended to Wilson or worked with Wilson to reverse a five-day disciplinary suspension that Redding had previously issued to Nachampassack. DSOF ¶ 38; Pl.'s Resp. DSOF ¶ 38. But they agree that Wilson reversed the five-day suspension that Redding had previously issued to Nachampassack. Pl.'s Resp. DSOF ¶ 39. Wilson also learned of two one-day suspensions issued on February 10, 2015 and June 12, 2015, and without receiving a Union grievance, reversed these suspensions. Nachampassack was paid in full for the three reversed suspensions. *Id.*

Under the collective bargaining agreement (CBA) at the time, Senior Toll Collectors selected their preferred shifts every thirteen weeks through a seniority-based bidding process. Pl.'s Resp. DSOF ¶ 40. Nachampassack was on leave when bidding occurred for the time period of March 1, 2016 through May 31, 2016, and, typically, employees who are on leaves of absences are not permitted to participate in the bidding process. However, at Wilson's direction and over the Union's objection, Nachampassack was able to bid on her preferred shift for this time period. *Id.*

### D. Nachampassack's Medical Leave

In connection with the birth of her youngest child, Nachampassack requested a leave of absence beginning on June 30, 2016, her due date, but began her leave on June 19, 2016, when she was put on bedrest as a result of suffering from severe swelling. Pl.'s Resp. DSOF ¶ 41; Def.'s Resp. PSOAF ¶ 24. On June 13, 2016, Cataudella sent an e-mail to Tollway employees Myesha Johnson, Marisol Perez, Reniece Wright, and Rhonda Robinson requesting that Nachampassack be placed under "surveillance" while she was out. Def.'s Resp. PSOAF ¶ 14. Nachampassack exhausted her FMLA leave on July 17, 2016,[4] but was granted ALWOP from July 18, 2016 to August 24, 2016, the original end date of her requested leave. Pl.'s Resp. DSOF ¶ 42. Cataudella recommended approval of the leave because it was relatively short in duration, and Nachampassack was expected to return to work at its conclusion. *Id.*

Nachampassack then requested that the Tollway extend her leave first through September 27, 2016, and then through October 31, 2016. Pl.'s Resp. DSOF ¶ 43. Cataudella declined to approve any additional ALWOP. *Id.* The parties dispute the reason for her decision. According to the Tollway, Cataudella declined to approve additional ALWOP because Nachampassack's ongoing absence was continuing to create operational challenges for Plaza 1. DSOF ¶ 43. Nachampassack, on the other hand, points to a September 7, 2016 email from Cataudella in which she states that

---

[4] Even though DSOF ¶ 42 refers to July 17, 2019, this appears to be a typographical error, as the evidence supporting this paragraph refers to July 17, 2016.

"[w]ithout the legal obligation to do so, I cannot operationally approve any additional authorized leave for this employee." Pl.'s Resp. DSOF ¶ 43; Def.'s Resp. PSOAF ¶ 15.

On September 22, 2016, the Tollway's ADA Coordinator emailed Nachampassack, notifying her that the Tollway "provides reasonable accommodations to qualified individuals with disabilities who are employees or applicants for employment, unless to do so would cause undue hardship." Pl.'s Resp. DSOF ¶ 44. The Tollway also sent Nachampassack documents to request an ADA accommodation. *Id.* As of October 6, 2016, Nachampassack had not provided documentation supporting an ADA accommodation request. *Id.* ¶ 45. On this day, the Tollway's ADA Coordinator sent Nachampassack a message stating, "To date, we have not received your ADA paperwork so that we can engage in the interactive process. Please return your paperwork to my attention by October 14, 2016." *Id.* Additionally, on the same day, Cataudella sent an email to other Tollway employees with a "HIGH" level of importance stating that Nachampassack had been denied additional ALWOP. Def.'s Resp. PSOAF ¶ 17. She further stated that Nachampassack had been referred to the ADA office and would not be considered for additional ALWOP without a determination of a qualifying disability. *Id.*

On October 14, 2016, Cataudella e-mailed Wilson and Tollway employee Beverly O'shea (O'shea) regarding beginning the separation process for Nachampassack. Def.'s Resp. PSOAF ¶ 18. On the same day, the Tollway received a Physician's Disability Determination Questionnaire from Nachampassack's physician, Dr. William Cunningham, in which he stated that Nachampassack

remained incapacitated until October 31, 2016 for postpartum depression but that she could return to work on November 1, 2016. Pl.'s Resp. DSOF ¶ 46. The Tollway approved Nachampassack's request to extend her leave through October 31, 2016. *Id.*

On November 1, 2016, Nachampassack provided the Tollway an updated Physician's Disability Determination Questionnaire from Dr. Cunningham, in which he stated that Nachampassack was anticipated to return to work on November 14, 2016. Pl.'s Resp. DSOF ¶ 47. On November 11, 2016, the Tollway received a note signed by Jill Weberg, an Advanced Practice Nurse who worked in the same office as Dr. Cunningham, stating that Nachampassack would be unable to return to work until further notice. *Id.* ¶ 48. The note also stated that Nachampassack had an appointment on December 9, 2016 for further evaluation. On November 15, 2016, Nachampassack submitted a revised Physician's Disability Determination Questionnaire from Dr. Cunningham, in which he stated that she was anticipated to return to work as of December 9, 2016. Based on this, the Tollway approved an extension of Nachampassack's leave through December 9, 2016. *Id.*

**E. The Tollway's Separation of Nachampassack**

Nachampassack did not return to work on December 9, 2016. Pl.'s Resp. DSOF ¶ 49. On December 16, 2016, the Tollway received a Physician's Disability Determination Questionnaire, which was signed by Dr. Marianne Geiger, a psychiatrist to whom Dr. Cunningham had referred Nachampassack. Dr. Geiger stated that Nachampassack was diagnosed with a major depressive disorder and that Nachampassack would be able to return to work on April 17, 2017. *Id.* On January 5,

2017, after consulting with Wilson, Sharon Ferguson (Ferguson), the Tollway's ADA Coordinator, sent Nachampassack a letter informing her that her request for an additional four months of leave under the ADA was denied. DSOF ¶¶ 50–51. In reviewing Nachampassack's leave request, according to Wilson, he accounted for the Tollway's high rates of absenteeism among staff, the fact that Nachampassack had previously informed the Tollway of several estimated return dates, and the fact that Nachampassack's physician had only provided an estimated return date. *Id.* ¶ 52. He was concerned that if she was granted additional leave, Nachampassack might not be able to return to work in April 2017; he considered how her continued leave impacted staffing at Plaza 1 and other plazas, because filling her absences required the Tollway to allocate a TRTCs to her position on a long-term basis, reducing its ability to fill other absences in the system without incurring overtime and other costs; and he considered that her extended leave prevented the Tollway from posting her position and filling it. *Id.* Wilson determined that Nachampassack's continued absence adversely affected operations at Plaza 1, and recommended that the Tollway deny her request for additional leave. DSOF ¶ 53. Nachampassack disputes Wilson's concerns, stating that during the relevant time period, Plaza 1 had numerous Collectors and the ability to hire temporary Collectors and that the Tollway already had a Collector working in her spot. Pl.'s Resp. DSOF ¶ 52.

Ferguson also sent Nachampassack a letter dated January 5, 2017, explaining that she could enter into an interactive process to explore alternative options or accommodations. Def.'s Resp. PSOAF ¶ 21. On January 18, 2017, Cataudella emailed

Myesha Johnson (Johnson), the District Supervisor responsible for Plaza 1, informing her that Nachampassack's ADA leave had expired and instructing her to contact Nachampassack and let her know that she was being returned to the work schedule at Plaza 1. DSOF ¶ 54; Def.'s Resp. PSOAF ¶ 22. The parties agree to some but also dispute some details of the communications between Johnson and Nachampassack. They agree that, on January 18, 2017, at approximately 10:00 a.m., Nachampassack and Johnson spoke over the phone, and Nachampassack informed her that she would return to work as required and chose the afternoon shift with a start date of January 19, 2017. Def.'s Resp. PSOAF ¶ 27. The parties also agree that on January 18, 2017, Johnson e-mailed Cataudella and other Tollway employees, letting them know that she spoke to Nachampassack and that Nachampassack had chosen the afternoon shift from 2:00 p.m.–10:00 p.m., with Tuesday and Wednesday off. *Id.* ¶ 23. Nachampassack then called Johnson back and told her she had a doctor's appointment for her daughter and asked if she could start the following week. *Id.* ¶ 28. Johnson responded that she could not and would be fired if she did not return to work, and Nachampassack told Johnson that she would be in the following day. *Id.*

The parties disagree about the status of Nachampassack's doctor's release. According to Johnson, during the January 18, 2017 call, Nachampassack informed her that Nachampassack's doctor had not released her to return to work, and Johnson told Nachampassack that if she could not return to work, her absences would be considered Unauthorized Leave Without Pay (ULWOP) and would lead to her separation from employment. DSOF ¶ 54. Cataudella and Nachampassack also spoke

on January 18, 2017, and, again, the parties dispute the nature of their conversation. They agree that Nachampassack told Cataudella that she would return to work as required. Def.'s Resp. PSOAF ¶ 29. But, according to Nachampassack, she informed Cataudella that she would return to work without a doctor's release so she could keep her job. Pl.'s Resp. DSOF ¶ 54. The parties agree that Cataudella told Nachampassack that she could not return to work without a doctor's release. *Id.*; Def.'s Resp. PSOAF ¶ 29. But, according to Cataudella, Nachampassack confirmed that her doctor had no intention of releasing her to return to work and that she would not be released. DSOF ¶ 55. Nachampassack contends that she never said this to Cataudella. Pl.'s Resp. DSOF ¶ 55. Additionally, according to Nachampassack, Cataudella told Nachampassack that she was "stuck between a rock and a hard place." Pl.'s Resp. DSOF ¶ 60; Def.'s Resp. PSOAF ¶ 30.

Cataudella then informed Wilson of her and Johnson's communications with Nachampassack, and Wilson recommended that Nachampassack be separated from employment. DSOF ¶ 56. The Tollway's Employee Policies and Procedures Manual (the Manual) defines a "discharge" as an "involuntary employment termination initiated by the Tollway." Pl.'s Resp. DSOF ¶ 57. The Manual defines a "separation" as the Tollway's discontinuation of an employment relationship with an employee "due to various circumstances, including but not limited to, an employee exhausting all Tollway benefit time and leave time, an employee no longer being capable of performing required job duties with or without a reasonable accommodation, or eliminating the employee's job position in conjunction with a layoff or reorganization."

13

*Id.* Nachampassack was separated from her employment with the Tollway. *Id.* On January 24, 2017, Deborah Allen (Allen), the Chief of Administration, sent Nachampassack a letter advising her that her employment was terminated effective the same day. *Id.* ¶ 58. As of this date, Dr. Geiger had not changed her assessment that Nachampassack was unable to return to work and would need to remain on leave until approximately April 17, 2017. *Id.* ¶ 67.

In January 2017, the Tollway's policy was to provide a 48-hour letter to an employee who had exhausted their approved leave and was not granted an extension of their leave. Pl.'s Resp. DSOF ¶ 59; Def.'s Resp. PSOAF ¶ 33. A 48-hour letter informed the employee that he or she must return to work within 48 hours, and if he or she does not, the Tollway would separate his or her employment. *Id.* Nachampassack never received a 48-hour letter from the Tollway. Def.'s Resp. PSOAF ¶ 34. But, according to the Tollway, a fact which Nachampassack disputes, Nachampassack was provided essentially the same information that would have been contained in a 48-hour letter. DSOF ¶ 60. Because Nachampassack had already confirmed to both Cataduella and Johnson that she would not be released to return to work, sending her a 48-hour letter after her conversations with them would have not resulted in her return to work or her employment separation. *Id.*

### F. Alleged Motivations for Nachampassack's Separation

Other than Nachampassack's disagreement with the Tollway's stated reasons for declining her request for further leave, the only other reason Nachampassack believes the Tollway's decision not to extend her leave was connected to her Redding

complaint was Cataudella's and Hopkins's alleged harassment of Nachampassack. Pl.'s Resp. DSOF ¶ 61.

For example, from 2013 to 2015, before Nachampassack complained about Redding's sexual harassment, Cataudella asked others to require that Nachampassack recertify her need for FMLA leave seven times. Pl.'s Resp. DSOF ¶ 62.[5] In the years before Redding's termination, Nachampassack had taken FMLA leave on several occasions, including intermittent leave. Cataudella Decl. ¶ 39. Redding directed Cataudella to ask the Tollway's FMLA vendor to seek recertification for Nachampassack's FMLA leave because of potentially suspect patterns of using her leave. But, Redding directed Cataudella to make similar requests for other employees. Because Nachampassack was married to Mike Doyle (Doyle), one of the Tollway's District Supervisors, there was some concern to ensure that Nachampassack did not receive special treatment. Cataudella was not aware of any personal relationship between Nachampassack and Redding at the time so she did not view Redding's FMLA directives as inappropriate or based on any improper motivation. *Id.* Bunting, a manager for Plaza 1 from 2013 to 2015, when asked whether Nachampassack was treated unfairly or differently than other Collectors, responded that "[w]ith the FMLA pattern abuse, I believe the information was requested often." Def.'s Resp. PSOAF ¶ 12.

Additionally, Nachampassack maintains that Cataudella was involved in issuing a performance review of Nachampassack in November or December 2015 that

---

[5]The parties also dispute whether in a *twelve-month period*, Cataduella requested that Nachampassack recertify seven times for FMLA leave. Def.'s Resp. PSOAF ¶ 9.

referenced the discipline Redding issued to Nachampassack, which was subsequently removed. Pl.'s Resp. DSOF ¶ 64. The parties dispute Cataudella's involvement in issuing Nachampassack's performance review. According to Nachampassack, Johnson prepared her review and Cataudella had reviewed it based on the fact that Cataudella had actually also reviewed Nachampassack's performance review in 2013. *Id.* According to Cataudella, she did not prepare Nachampassack's 2015 performance review and did not review it before it was presented to Nachampassack. DSOF ¶ 64.

Nachampassack suggests that Johnson harassed her on two occasions after Redding's termination. Pl.'s Resp. DSOF ¶ 65. First, Johnson issued the 2015 performance review of Nachampassack. Second, after the discipline Redding issued to Nachampassack was reversed, Nachampassack testified that "Johnson re-issued the review without referencing the discipline, but did so in abrupt manner, by declining to issue the review in private and 'throw[ing]' the review at Nachampassack across the table and telling her to read it to herself." *Id.*

### G. Nachampassack's Ongoing Inability to Work

Nachampassack has not been employed since she was separated from the Tollway. Pl.'s Resp. DSOF ¶ 68. As of the date of filing of the Tollway's motion, Nachampassack's physician had not released Nachampassack to return to work. *Id.* ¶¶ 68–69. Before her separation from the Tollway, Nachampassack applied for and was granted long-term disability benefits through the State Retirement System, which she continues to receive. *Id.* ¶ 69.

### H. Other Collectors' Leave Requests

Before her separation from the Tollway, Nachampassack was absent from work for 219 calendar days, including 190 days after she exhausted her FMLA leave. Pl.'s Resp. DSOF ¶ 70. Nachampassack identifies two Collectors at Plaza 1 who were allegedly permitted to remain on leave for more than ten months. *Id.* ¶ 71. Carrie Walker took leave in 2016 and 2017, and after exhausting her FMLA leave, her leave spanned seven calendar days across those years, well below the 190 days of leave Nachampassack took beyond her FMLA leave entitlement. Further, Walker returned to work and her employment was not terminated. *Id.* Courtney Coates took a leave spanning eleven calendar days beyond her FMLA leave entitlement. *Id.* ¶ 72. She returned to work and her employment was not terminated. *Id.*

The Tollway separated several Collectors related to leave. On June 8, 2016, the Tollway separated Kathleen Hasket due to her inability to return to work after her request for additional ALWOP was denied. Pl.'s Resp. DSOF ¶ 73. At that time, Haskett's leave spanned 145 calendar days after exhausting her available FMLA leave. *Id.* On August 3, 2016, the Tollway separated Mary Ellen Glaros due to her failure to return to work after an approved leave. *Id.* ¶ 74. At the time of her separation, Glaros, who was not eligible for FMLA, had been continuously absent from work since January 12, 2016, a period spanning 204 calendar days. *Id.* On March 2, 2017, the Tollway separated Chanel Greer after she failed to return to work from a medical leave of absence. *Id.* ¶ 75. Prior to her separation, Greer was away from

17

work for spanning 84 calendar days after she exhausted her FMLA leave. *Id.* Wilson had recommended separation for all three Collectors. *Id.* ¶ 76.

Coates, Glaros, and Haskett each received 48-hour letters from the Tollway. Def.'s Resp. PSOAF ¶ 34. Additionally, Tollway employee no. 012099 was off on ADA leave for 221 days from May 22, 2017 to December 29, 2017. *Id.* ¶ 36. Tollway employee no. 015082 had ALWOP from January 13, 2016 to March 21, 2016 and ULWOP from March 22, 2016 to August 1, 2016 (a total of 201 days). *Id.* ¶ 37. Tollway employee No. 011452 had ALWOP from January 23, 2016 to April 6, 2016 and ULWOP from April 7, 2016 to June 8, 2016 (a total of 137 days). *Id.* ¶ 38.

## I. EEOC Claim Letter

From June 27, 2017 through July 17, 2017, Nachampassack worked with her attorney, Bryan O'Connor (O'Connor), to prepare a claim letter to the Equal Employment Opportunity Commission (EEOC). Def.'s Resp. PSOAF ¶ 1. On July 17, 2017, Nachampassack sent a signed EEOC letter to O'Connor. *Id.* ¶ 2.

The parties agree as to certain facts surrounding a letter dated July 18, 2017. Pl.'s Resp. DSOF ¶ 6. They agree it was on O'Connor's letterhead and stated that it was Nachampassack's "formal filing of a charge of discrimination against the [Tollway]." *Id.* They also agree that the letter is not stamped as received by the EEOC, was not referenced on the official EEOC charge of discrimination filed with the EEOC on November 9, 2017, and was not referenced in the EEOC's Notice of Right to Sue. *Id.*

The parties dispute how this letter was used in connection with Nachampassack's filing of a charge with the EEOC. According to Nachampassack, O'Connor told her that the letter was submitted to the EEOC, and that it was sent to the EEOC on July 18, 2017. Pl.'s Resp. DSOF ¶ 6; Def.'s Resp. PSOAF ¶ 3. The Tollway disputes that the letter was sent to the EEOC. Def.'s Resp. PSOAF ¶ 3.

On November 7, 2017, Nachampassack received an email from the EEOC with a verification code. Def.'s Resp. PSOAF ¶ 4. On November 9, 2017, Nachampassack filed a charge of discrimination with the EEOC. DSOF ¶ 4.[6] On November 27, 2017, the EEOC dismissed Nachampassack's charge of discrimination and issued a Notice of Right to Sue. Pl.'s Resp. DSOF ¶ 5. Nachampassack filed this lawsuit on January 23, 2018. *Id.*

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the

---

[6]For this fact, the Tollway cites the charge form attached to Nachampassack's Complaint. While this, on its own, does not admit this document into evidence, the Court takes judicial notice of this fact pursuant to Federal Rule of Evidence 201(b). *See Ochana v. Flores*, 199 F. Supp. 2d 817, 831 (N.D. Ill. 2002) ("Rule 201(f) allows a court to take . . . judicial notice at the summary judgment stage.") (internal citation omitted). And a court can take judicial notice of an EEOC charge form. *See Metz v. Joe Rizza Imports, Inc.*, 700 F. Supp. 2d 983, 989 n.2 (N.D. Ill. 2010); *Anderson v. Ctrs. for New Horizons, Inc.*, 891 F. Supp. 2d 956, 959 (N.D. Ill. 2012). Additionally, Nachampassack does not properly dispute this fact itself because she does not present any contrary evidence controverting this fact. *See* N.D. Ill. Loc. R. 56.1(e)(3) ("To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.").

initial burden of showing that there is no genuine dispute and that it is entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## Analysis

Nachampassack asserts three counts against the Tollway. Compl.[7] In Count I, Nachampassack alleges that in 2016 and 2017, her medical provider ordered that she could not work for a period of time due to her post-partum syndrome and disability. Compl. ¶ 20. She also alleges that in 2017, her medical provider ordered that she could not work for a period of time due to her post traumatic stress disorder disability. *Id.* ¶ 21. Because of these conditions, she claims she qualified as a disabled person

---

[7]This case was originally pending before Judge Ellis and was transferred Judge Pacold on August 23, 2019. R. 39. It was then transferred to this Court on September 28, 2020. R. 67.

under the ADA. *Id.* ¶ 23. So, in January 2017, when the Tollway ordered her to return to work, she requested an unpaid work accommodation based on her disabilities. *Id.* ¶ 27. She claims that the Tollway violated the ADA by failing to accommodate her (refusing to extend her necessary medical leave), and wrongfully terminating her. *Id.* ¶ 32.

In Counts II and III, Nachampassack alleges that because she participated in the sexual harassment investigation of Redding, the Tollway retaliated against her "by subjecting her to unjust scrutiny; false allegations of misconduct; unwelcome and derisive comments; and a hostile and stressful work environment." Compl. ¶¶ 39, 44. In both counts, she further alleges that the Tollway retaliated against her by "refusing to accommodate her disability and ultimately terminating her." *Id.* ¶¶ 40, 45. She claims that the Tollway's conduct violated Title VII. *Id.* ¶¶ 41, 46. The allegations of both counts are largely similar. Yet, Nachampassack has titled Count II "Retaliation & Wrongful Discharge" and Count III "Hostile Work Environment." So the Court interprets these counts as claims for violation of Title VII by retaliation and wrongful discharge under Count II and hostile work environment under Count III. However, Nachampassack's Title VII wrongful termination claim appears to be identical to a portion of her Title VII retaliation claim (where she claims that one of the many retaliatory events was her termination), so to the extent the Court reviews these claims on the merits, the Court considers her Title VII wrongful termination claim as identical to the portion of her Title VII retaliation claim related to her wrongful termination.

The Tollway advances three arguments in support of its summary judgment motion. First, the Tollway argues that some of Nachampassack's claims are time-barred because she failed to file her EEOC charge within 300 days after the alleged violations. R. 65, MSJ Memo. at 1. Second, the Tollway asserts that Nachampassack's ADA claim fails because she was not a qualified individual with a disability. *Id.* Third and finally, it argues that Nachampassack presents no evidence that she was subject to a hostile work environment or that her harassment complaint was a but-for cause of the Tollway's decisions regarding her leave requests or her employment separation from the Tollway. *Id.* at 1–2.

Before addressing the substance of the motion, the Court must address a preliminary matter. Nachampassack makes several general objections in her response to the Tollway's Statement of Facts. First, she argues that the Tollway's paragraphs are actually more than 80 paragraphs because the Tollway improperly combines multiple facts into single paragraphs, in violation of Local Rule 56.1(a)(3). Pl.'s Resp. DSOF at 1. Second, she contends that the Tollway's Statement of Facts inappropriately contains legal conclusions and legal argument. *Id.* Third, she asserts that the Tollway has failed to support certain factual assertions to the record or otherwise mischaracterizes those factual assertions. *Id.*

The Tollway also objects to Nachampassack's denial of some of the Tollway's factual statements, contending that Nachampassack fails to include specific citations to the record or evidence, or that Nachampassack misstates information. R. 83, Reply at 1–2.

Local Rule 56.1 requires the moving party to file a statement of facts that demonstrates its entitlement to judgment as a matter of law. *Petty v. City of Chi.*, 754 F.3d 416, 420 (7th Cir. 2014). The nonmoving party then must file a response to that statement and may provide a separate statement of additional facts. *Id*; N.D. Ill. Loc. R. 56.1(b)(3). "Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." N.D. Ill. Loc. R. 56.1 (e)(2). Further, "[t]o dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. Loc. R. 56.1 (e)(3). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Moreover, neither party's statement of facts should contain legal argument. N.D. Ill. Loc. R. 56.1(d)(4).

District courts have discretion to enforce strict compliance with Local Rule 56.1's requirements. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *see also Hanover Ins. Co. v. House Call Physicians of Ill.*, 2016 WL 1588507, at *2 (N.D. Ill. Apr. 19, 2016) (collecting cases). Therefore, to the extent either Nachampassack or the Tollway fails to properly dispute any of the other's asserted facts, the Court deems those facts admitted. Where any such facts are material to the Court's analysis, the Court notes them within this Opinion. Furthermore, the Court

does not consider any asserted facts "not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes." *Brown v. Target Corp.*, 2013 WL 5737344, at *1 (N.D. Ill. Oct. 22, 2013). The Court also disregards any legal argument contained in either party's statement of facts. But the Court declines to disregard paragraphs in Tollway's statement of facts containing more than one fact, as there is no requirement that paragraphs in statements of facts be limited to one fact only, only that they be "concise." N.D. Ill. Loc. R. 56.1(d)(1).

Having addressed these preliminary Local Rule 56 matters, the Court now turns to the Tollway's substantive arguments in support of its motion for summary judgment. The Court begins with the Tollway's statute of limitations argument.

## I.  Statute of Limitations

A plaintiff who brings Title VII claims, has "300 days from the alleged discriminatory or retaliatory act to file a timely charge of discrimination with the EEOC." *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 744 (7th Cir. 2021) (citing 42 U.S.C. § 2000e-5(e)(1)). The same is true of discrimination claims under the ADA because its enforcement provision expressly incorporates Section 2000e-5 of Title VII. *Foster v. Chi. Transit Auth.*, 2015 WL 5693527, at *2 (N.D. Ill. Sept. 28, 2015). A defendant can raise as an affirmative defense "a plaintiff's failure to timely file a charge with the EEOC." *Chatman*, 5 F.4th at 744 (internal citation omitted).

> At summary judgment, a defendant who asserts this affirmative defense must show that there is no genuine dispute of material fact as to whether the plaintiff timely filed with the EEOC. The defendant can establish its affirmative defense in two ways. One is by pointing to evidence that affirmatively shows that the plaintiff failed to timely file. The other is by pointing to the absence of evidence in the record to support the plaintiff's

timeliness. If the defendant meets its burden by pointing out the absence of evidence, the plaintiff must then demonstrate that there is evidence upon which a jury could determine that she timely filed with the EEOC.

*Id.* (internal quotation and citations omitted).

Hostile work environment claims may involve repeated conduct and such claims are based on the "cumulative effect of individual acts." *Monroe v. Columbia Coll. of Chi.*, 2018 WL 4074190, at *4 (N.D. Ill. Aug. 27, 2018) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* (quoting *Morgan*, 536 U.S. at 117).

## A. Reasonable Accommodation and Hostile Work Environment

The Tollway first argues that only alleged unlawful employment actions that occurred on or after January 13, 2017 are timely, based on November 9, 2017 as the date of filing for Nachampassack's EEOC charge. MSJ Memo. at 5–6. Therefore, because she was notified of the Tollway's decision to deny her request to extend her leave of absence by an additional four months on January 5, 2017, her reasonable accommodation claim under the ADA (Count I) is untimely. *Id.* at 6. Additionally, because Nachampassack never returned to work after June 19, 2016, Nachampassack could not have experienced a hostile work environment on or after January 13, 2017, so her hostile work environment claim (Count III) is also untimely. *Id.*

25

Nachampassack responds that November 9, 2017 is the incorrect filing date for her EEOC charge. R. 75, Resp. at 6. Instead, she maintains that the filing date is July 19, 2017, which is the date the July 2017 EEOC claim letter was delivered to the EEOC, after O'Connor sent the letter to the EEOC's Chicago District Office on July 18, 2017. *Id.* at 6–7. Nachampassack insists that her EEOC claim letter was received prior to November 7, 2017, because she received a verification code from the EEOC on November 7, 2017. *Id.* at 7. Thus, Nachampassack asserts that September 20, 2016 is the correct triggering date, not January 5, 2017. As a result, she suggests that her claims under Counts I and III are timely. *Id.*

The evidence before the Court reveals that on July 17, 2017, Nachampassack sent O'Connor a signed EEOC claim letter, that O'Connor had prepared. Def.'s Resp. PSOAF ¶¶ 1–2. The letter is dated July 18, 2017, and states that it is Nachampassack's "formal filing of a charge of discrimination against the [Tollway]." Pl.'s Resp. DSOF ¶ 6 (citing Compl. Exh. 1). But the letter does not show a stamp indicating that it was received by the EEOC. *Id.* Nachampassack's argument that the filing date is July 19, 2017 rests on (i) the fact that O'Connor told her about the delivery of the letter; and (ii) a proof of delivery document purportedly showing a Federal Express delivery. PSOAF ¶ 3. During her deposition, when asked if she knew whether the letter was submitted to the EEOC, Nachampassack responded, "He told me." R. 66-2, Exh. 1, Nachampassack Tr. at 144:21–23. When asked if she knew when it was submitted, she responded, "No, I don't remember. I'm sure he told me at the time." *Id.* at 144:24–145:2. The Tollway contends that these statements constitute

26

inadmissible hearsay. Reply at 3. Hearsay is "an out-of-court statement offered to prove the truth of the matter asserted." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 575 (7th Cir. 2021) (citing Fed. R. Evid. 801(c)). And the Court agrees with the Tollway that Nachampassack's statements about what her attorney told her regarding the letter are hearsay because they are out-of-court statements offered to prove that the letter July 2017 letter was in fact submitted to the EEOC. To be considered on summary judgment, "evidence must be admissible at trial, though the form produced at summary judgment need not be admissible. If the evidence is inadmissible hearsay, the courts may not consider it." *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (internal quotation and citations omitted). Nachampassack has not advanced any hearsay exception that renders this evidence admissible. Accordingly, the Court cannot consider it for the purposes of summary judgment. *Cairel*, 821 F.3d at 830; *see also Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.").

The proof of delivery fares no better. It is a screenshot of a folder that appears to be titled "EEOC" and which appears to show a list of files in the folder, one of which is a .msg file with the subject line "FedEx Shipm..elivered." R. 79-1, Exh. 3. On the bottom right corner of the screenshot, two lines of text state, "FedEx Shipment 779674857333 Delivered.msg." *Id.* This screenshot proves nothing. It lacks any reference to a date, a sender's address, a recipient's address, or the EEOC claim letter

itself. It also lacks any authentication by O'Connor, so the source of the screenshot is unknown too.

Nachampassack invites the Court to speculate that because she received a verification code from the EEOC on November 7, 2017, her claim letter must have been received prior to November 7, 2017. Resp. at 7. But, as the Tollway points out, the email is dated almost four months after the July 17, 2017 letter was supposedly sent, and the email makes no reference to Nachampassack's July 2017 EEOC charge or that she filed an EOOC charge in July 2017. Reply at 3.

The Tollway has met its burden showing that Nachampassack lacks evidence supporting Nachampassack's argument that she filed her EEOC charge in July 2017. *See Chatman*, 5 F.4th at 744. And Nachampassack has not presented any evidence upon which a jury could determine she filed her EEOC charge in July 2017. *Id.*[8]

Accordingly, Nachampassack's reasonable accommodation claim under Count I, that the Tollway violated the ADA by refusing her request for a reasonable accommodation based on its denial on January 5, 2017 of her request to extend her medical leave, is time-barred by the statute of limitations. Nachampassack's hostile work environment claim under Count III, that the Tollway violated Title VII by subjecting her to a hostile work environment, is also time-barred. As the Tollway points out, Nachampassack did not return to work after June 19, 2016 (which would be well outside the 300-day window even if she had filed her EEOC charge on July 17, 2017), so there is no way she could have experienced a hostile work environment

---

[8]The only document showing that Nachampassack filed something with the EEOC is the November 9, 2017 charge of discrimination form.

after this date. MSJ Memo. at 6. Nachampassack also has not presented evidence that shows she was subject to a hostile work environment on or after January 13, 2017—no evidence shows or even suggests that she was subject to unwelcome harassment on or after January 13, 2017. *See Cooper-Schit v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) (a plaintiff must demonstrate that he or she was subject to unwelcome harassment for a Title VII hostile work environment claim).

## B. Wrongful Termination

Next, the Tollway contends that Nachampassack's wrongful termination claims are also time-barred based on the fact that the limitations period for filing an EEOC charge runs from the date the employee is notified of an allegedly discriminatory employment decision, not from the date she experiences the consequences of the discrimination. MSJ Memo. at 6 (citing *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)).[9] The Tollway maintains that it notified Nachampassack it was denying her request to extend her leave on January 5, 2017, and a consequence of that decision was her employment separation. *Id.* Accordingly, because she knew of the decision denying her leave request more than 300 days before she filed her charge (based on a November 9, 2017 charge filing date), her wrongful termination

---

[9]In its memorandum in support of its motion, the Tollway repeatedly refers to Nachampassack's wrongful termination *claim* in the singular. MSJ Memo. at 6. But, it refers to both of Nachampassack's wrongful termination *claims*, under Title VII and the ADA, in its reply. Reply at 4. The Court considers the Tollway's argument as applying to both of Nachampassack's wrongful termination claims. Because the analysis as to the timeliness of wrongful termination claims brought under Title VII and the ADA is the same, Nachampassack is not prejudiced by this interpretation. *See* 42 U.S.C. § 2000e–5(e) and § 12117(a) (adopting for purposes of the ADA the limitations period set forth for Title VII claims).

claims are untimely too. *Id.* Surprisingly, Nachampassack offers no response to the Tollway's request to apply *Ricks* to this case and has seemingly waived this argument. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

Yet, the authority the Tollway references does not support its argument. In *Ricks*, the plaintiff, a college professor, brought a national origin discrimination claim against the defendant, a college, after the college denied him tenure. 449 U.S. at 252–54. The plaintiff filed an internal grievance, and while the grievance was under consideration, the college offered, and the plaintiff accepted a one-year "terminal" contract. *Id.* at 253–54. Shortly thereafter, the college notified the plaintiff that his grievance had been denied. *Id.* at 254. The trial court dismissed the plaintiff's claim based on the expiration of the statute of limitations. *Id.* at 254–55. The Supreme Court held that the statute of limitations period began to run on the date the college informed the plaintiff that he would be denied tenure and not when his one-year contract expired. *Id.* at 261–62. The Supreme Court found that the plaintiff's claim accrued—and he could have sued—when the college informed him that he would be denied tenure and gave him explicit notice that his employment would end when his one-year contract expired. *Id.* at 258. The court concluded that "[t]he only discrimination alleged occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated to [the plaintiff]." *Id.* at 252. The court also noted that the result in *Ricks* was dictated by

the particular facts of the case and that the principles discussed in the case could only be applied on a case-by-case basis. *Id.* at 258 n.9.

The Tollway relies on *Ricks* and contends that the *Ricks* rule[10] bars Nachampassack's wrongful termination claim. MSJ Memo. at 6 (citing *Barrett v. Ill. Dep't of Corrections*, 803 F.3d 893 (7th Cir. 2015)). While the Tollway cites *Barrett*, it admits that it is inviting the Court to apply *dicta* from *Barrett* to extend the *Ricks* rule here. But *dicta* itself is non-binding and has no precedential value. *See In re RQM, LLC*, 2011 WL 3205361, at *3 (N.D. Ill. July 28, 2011).

Regardless, the *dicta* does not result in the Tollway's requested outcome. In *Barrett*, the defendant-employer had a policy that an employee could be fired if she accumulated twelve unauthorized absences of work. 803 F.3d at 894. The plaintiff was fired in October 2010 because she had accumulated twelve unauthorized absences over a period of several years. *Id.* at 895. The plaintiff filed suit in January 2012, alleging that the statute of limitations period began running on the date her employment was terminated. *Id.* The Seventh Circuit disagreed, holding that when "an FMLA plaintiff alleges that his employer violated the [FMLA] by denying qualifying leave, the last event constituting the claim ordinarily will be the employer's rejection of the employee's request for leave." *Id.* at 897. Specifically, the Seventh Circuit rejected the district court's attempt to draw an analogy between the FMLA and Title VII. *Id.* at 897–98. Further, it noted, though, that even if an analogy

---

[10]This principle is known as the "*Ricks* rule." *See Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 456 (7th Cir. 2018).

to Title VII were appropriate, the plaintiff could not prevail. *Id.* at 898. The court then stated that the "discrete act" which starts the Title VII limitations clock is the discriminatory decision itself, not the "*consequences* of the act" which may materialize later. *Id.* (citing *Ricks*, 449 U.S. at 258). This previous sentence constitutes *dicta* which the Tollway asks the Court to rely on to throw out Nachampassack's wrongful termination claim. Notably absent from the Tollway's briefs is any other authority extending *Barrett*'s *dicta* to a claim under Title VII (or for that matter the ADA) or a case with a similar factual posture as this case. And, "[i]t is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Vertex Refining, NV, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 374 F. Supp. 3d 754, 765 (N.D. Ill. 2019) (citing *Doherty v. City of Chi.*, 75 F.3d 318, 324 (7th Cir. 1996), amended (Mar. 28, 1996)). The Court disagrees with the Tollway that the *dicta* from *Barrett*, notwithstanding its non-binding effect and lack of precedential value, suggests that Nachampassack's wrongful termination claims are barred by the statute of limitations.

Moreover, even assuming the *Ricks* rule has any application to this case, in *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004), the Seventh Circuit, in applying the *Ricks* rule, held in discriminatory discharge cases, two elements are required to establish the date on which the unlawful employment practice occurred. First, "there must be a final, ultimate, non-tentative decision to terminate the employee." *Id.* (citing *Ricks*, 449 U.S. at 258–59). Second, "the employer must give the employee 'unequivocal' notice of its final termination decision." *Id.*

(citing *Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 486 (7th Cir. 2002)). The Tollway has presented no evidence showing that either of these elements was satisfied before January 13, 2017, which would be the first day of the 300-day limitations period based on a November 9, 2017 charge filing date. In fact, the evidence only shows that on January 5, 2017, Ferguson sent Nachampassack a letter informing her that her request for an additional four months of leave under the ADA was denied. DSOF ¶¶ 50–51. Wilson, who Ferguson had consulted with before sending Nachampassack this letter, only recommended that the Tollway deny Nachampassack's request for leave. *Id.*; *id.*at ¶ 53. No evidence suggests that the Tollway decided to terminate Nachampassack's employment with the Tollway at that time. In fact, Ferguson then sent Nachampassack a letter dated January 5, 2017, explaining that she could enter into an interactive process to explore alternative options or accommodations. Def.'s Resp. PSOAF ¶ 21. And, soon after January 13, 2017, specifically on January 18, 2017, the Tollway and Nachampassack were working on Nachampassack's imminent return to work. Def.'s Resp. PSOAF ¶¶ 27; 23.

The Court finds that Nachampassack's wrongful termination claims, both under the ADA (Count I) and Title VII (Count II), are not time-barred.

## II. Qualified Individual

The Tollway then argues that Nachampassack was not a "qualified individual" under the ADA, and therefore her ADA claim fails as a matter of law. MSJ Memo. at 7–8. The Tollway again refers to Nachampassack's ADA *claim* in the singular both in

its memorandum in support of its motion and its reply. MSJ Memo. at 7–8; Reply at 4–6. But, under Count I, Nachampassack has two claims under the ADA—failure to accommodate and wrongful termination. *See* Compl. Both parties' briefs imprecisely refer to Nachampassack's ADA *claim* in the singular, even though the Tollway's arguments attack, and Nachampassack's arguments support, *both* ADA *claims*. *See* MSJ Memo. at 7–8; Reply at 4–6; Resp. at 7–8. Because the Court has already ruled that Nachampassack's failure to accommodate claim is time-barred, the Court only considers the parties' arguments as they pertain to Nachampassack's ADA wrongful termination claim.

The ADA prohibits employers from discriminating against a qualified individual with a disability because of [her] disability. 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."). This includes disparate treatment or failure to accommodate. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (citing 42 U.S.C. § 12112(b)(5)(A)). "A claim for *disparate treatment* based on disability under the ADA . . . requires proof (1) plaintiff was disabled; (2) plaintiff was qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of adverse employment action." *Id.* (internal citation omitted) (emphasis in the original). "At summary judgment, it is the plaintiff's burden

to provide evidence such that a rational jury could find her to be a qualified individual." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 628 (7th Cir. 2020).

The Tollway attacks the threshold element as to whether Nachampassack was a "qualified individual," arguing that because Nachampassack did not and could not return to work, she could not perform her job duties, and therefore she does not fall within the definition of a "qualified individual." MSJ Memo. at 7 (citing 42 U.S.C. § 12111(8)). It then posits that Nachampassack's long-term leave disqualifies her from being a "qualified individual." *Id.* Finally, the Tollway argues that at no time since Nachampassack requested four additional months of leave in January 2017 has her doctor released her to return to work, so she was not a "qualified individual" when the Tollway separated her from employment. *Id.* at 7–8.

Nachampassack counters that she was ready to return to work in January 2017, but that Cataudella did not afford her the opportunity to do so. Resp. at 7–8. Nachampassack also contends that the Tollway has mischaracterized her January 2017 leave request, instead suggesting that the Physician's Disability Determination Questionnaire asks for an estimated return to work date, "which does not mean 'at least' for an additional four months." *Id.* at 8. Nachampassack then states that her physician wrote on this form that she was expected to improve with a return to work on April 17, 2017. But, she then claims in a conclusory manner, without citing to any factual support, that she "was ready to return to work and qualified to perform the essential job functions." *Id.* As a result, she argues that her ADA claim does not fail as a matter of law. *Id.*

To determine whether an employee is a "qualified individual," a court first considers whether the employee satisfies the prerequisites for the position and second considers whether the employee can perform the essential functions of the job with or without a reasonable accommodation. *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241–42 (7th Cir. 2018). It is this second consideration that the parties dispute.

As the Tollway points out, the Seventh Circuit has held that "an employee who does not come to work cannot perform the essential functions of his job." *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998). And "a medical leave spanning multiple months does not permit the employee to perform the essential functions of his job." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (holding that intermittent time off or a short leave of absence such as a couple of days or even several weeks may be analogous to a part-time work or modified work scheduled permitted under 42 U.S.C. § 12111(9)). Put another way, "the inability to work for a multi-month period removes a person from the class protected by the ADA." *Id.* (internal quotation and citation omitted). Thus, an employee who needs long-term medical leave cannot work and is not a "qualified individual." Furthermore, after a doctor evaluates an employee, an "employer is entitled to rely on a physician's recommendation that the employee is not able to safely perform an essential function of his job." *McAllister v. Innovation Ventures, LLC*, 983 F.3d 963, 968 (7th Cir. 2020) (quoting *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 294 (7th Cir. 2015)). Without contrary evidence, "a doctor's view that an employee cannot return to work

in any position means an employee cannot establish that she is a 'qualified individual' with a disability under the ADA." *Id.* (internal quotation and citations omitted).

Nachampassack's response only references language from *U.S. Equal Emp. Opportunity Comm'n v. S&C Elec. Co.*, 303 F. Supp. 3d 687 (N.D. Ill. 2018) in support of her contention that she is a "qualified individual." *See* Resp. at 8. But Nachampassack's reliance on this alleged authority is problematic and troubling to the Court. Nachampassack quotes the following language:

> Under the ADA, a qualified individual with a disability is someone who can: (1) satisfy the requisite skill, experience, education and other job-related requirements of the employment position in question; and (2) perform the essential functions of the position, with or without an accommodation. Americans with Disabilities Act of 1990 § 102, 42 U.S.C.A. § 12112(a). Employee's allegations that he received long-term medical care, that he received clearance to work, and that he sought to return to work without accommodation were sufficient to plead that employee was a qualified individual with disability, as required for his ADA discrimination claim after he was terminated; employee alleged that he was terminated because he could return to work, not because he could not work. Americans with Disabilities Act of 1990 § 102, 42 U.S.C.A. § 12112(a). Whether an individual is a qualified individual with a disability under the ADA is determined at the time of the employment decision. Americans with Disabilities Act of 1990 § 102, 42 U.S.C.A. § 12112(a).

Resp. at 8 (quoting *S&C Elec.*, 303 F. Supp. 3d at 687). This quoted language is misleading—it is not from the opinion itself but instead from the first three Westlaw headnotes that typically appear before opinions published on Westlaw. Westlaw headnotes are not legal authority. *See Tyson v. Jones & Laughlin Steel Corp.*, 958 F.2d 756, 762–63 (7th Cir. 1992) (holding that case authority from a Westlaw headnote is "not authority; rather, it is a publisher's interpretation of what the particular court stated."); *see also Solvay USA v. Cutting Edge Fabrication, Inc.*, 521

F. Supp. 3d 718, 727 (N.D. Ill. 2021) (noting that one of the glaring problems with a party's citation is that the quoted text does not appear anywhere in the body of the opinion but instead comes from the Westlaw headnote). Moreover, in the case, the court was ruling on the defendant's motion to dismiss for failure to state a claim, not a motion for summary judgment. *S&C Elec.*, 303 F. Supp. 3d at 688.

Simply put, Nachampassack has failed to meet her burden by providing evidence that would allow a rational jury to find that she could safely perform the essential functions of her job. Here, it is undisputed that in 2016, Nachampassack did not return to work on December 9, 2016, which was her prior return to work date after the Tollway approved her extension of leave. Pl.'s Resp. DSOF ¶¶ 48–49. It is also undisputed that on December 16, 2016, the Tollway received a Physician's Disability Determination Questionnaire, signed by Nachampassack's doctor, Dr. Geiger, in which Dr. Geiger stated that Nachampassack was diagnosed with a major depressive disorder and that Nachampassack would be able to return to work on April 17, 2017. *Id.* ¶ 49. On the form itself, when asked if Nachampassack could "safely perform the duties" of her job, Dr. Geiger answered "NO." R. 66-2, Exh. 2 at CM/ECF 85 of 401. Finally, Nachampassack does not deny that, as of the date of the filing of the MSJ, Nachampassack's physician had not released her to return to work. Pl.'s Resp. DSOF ¶¶ 68–69. True, on January 18, 2017, Nachampassack told Catauduella that she would return to work as required. Def.'s Resp. PSOAF ¶ 29. But there is no evidence supporting Nachampassack's suggestion that her doctor could have released her to return to work earlier than April 17, 2017, or for that matter, that her doctor

actually did. The Tollway was entitled to rely on Nachampassack's doctor's opinion that she could not safely perform the duties of her job and could not return to work until at least April 17, 2017. Regardless of Nachampassack's own assessment in her response that she was ready to return to work in January 2017, the undisputed evidence shows that she was unable to safely perform the duties of her job until at least April 17, 2017, a period of approximately four months from January 2017. Accordingly, Nachampassack cannot establish that she was a "qualified individual" under the ADA at the time of her employment separation, and her ADA wrongful termination claim fails as a matter of law.

### III.       Retaliation/Wrongful Termination

The Tollway next contends that Nachampassack cannot establish a *prima facie* case of retaliation under Title VII. MSJ Memo. at 8–15. In Count II, Nachampassack claims that because she participated in the sexual harassment investigation of Redding, the Tollway retaliated against her by "subjecting her to unjust scrutiny; false allegations of misconduct; unwelcome and derisive comments; and a hostile and stressful work environment" and by "refusing to accommodate her disability and ultimately terminating her." Compl. ¶¶ 39–40. Nachampassack alleges various types of retaliatory actions and also alleges a wrongful termination based on her participation in the Redding sexual harassment investigation. While the Tollway refers to Nachampassack's Title VII retaliation claim in this portion of its motion, because the Court interprets her Title VII wrongful termination claim as identical to a portion of her Title VII retaliation claim and subsumed by it, the Court assumes

that the Tollway's arguments also apply to Nachampassack's Title VII wrongful termination claim.

Title VII prohibits employers from retaliating against employees who engage in a protected activity. 42 U.S.C. § 2000e–3(a). "To make out a *prima facie* case for retaliation under Title VII, a plaintiff must show that a reasonable jury could find that (1) [she] engaged in statutorily protected activity; (2) [her] employer took a materially adverse action against [her]; and (3) the adverse action was caused by the protected activity." *Miller v. Chi. Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) (internal citation omitted). If a plaintiff establishes a *prima facie* case of retaliation,

> an employer may produce evidence which, if taken as true, would permit the conclusion that it had a legitimate non-discriminatory reason for taking the adverse employment action. If the employer meets this burden, the plaintiff, to avoid summary judgment, then must produce evidence that would permit a trier of fact to establish, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination.

*Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (internal citations omitted). "[T]he question for a retaliation claim should always be: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?'" *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (internal quotation and citation omitted).

The Tollway does not contest the first two elements but argues that Nachampassack cannot establish the third element, the requisite causal connection. MSJ Memo. at 8. The Tollway advances several arguments: that Nachampassack can point to no direct evidence of retaliation tied to her sexual harassment complaint

about Redding (*id.* at 8–9); that Nachampassack cannot establish that Wilson or Cataudella bore any animus toward her protected activity (*id.* at 9–10); that Nachampassack's harassment allegations do not support an inference of retaliation (*id.* at 10–11); that the timing of Nachampassack's separation does not support a retaliation inference (*id.* at 12); and that the Tollway's separation decision regarding Nachampassack was consistent with how it treated other Tollway employees (*id.* at 12–13). Nachampassack contests each of these arguments. Resp. at 9–14. While Nachampassack does not identify the specific, numerous retaliatory actions in the Complaint, she references them in her response.

A plaintiff must show "but-for" causation to establish the causation element for a Title VII retaliation claim. *Chatman*, 5 F. 4th at 748–49 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "The plaintiff must show that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id.* (quoting same). Additionally, to establish causation, a plaintiff can either rely on direct evidence or "circumstantial evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation." *Robertson*, 949 F.3d at 379 (internal quotation and citation omitted).

**A. Direct Evidence**

The Court agrees with the Tollway that Nachampassack has not presented any direct evidence supporting causation. As the Tollway points out, Nachampassack has not presented evidence suggesting that anyone in Tollway management took issue

with her reporting Redding's sexual harassment and his subsequent termination. MSJ Memo. at 9. Nachampassack maintains that her requests for additional leave through April 2017 constitute direct evidence. Resp. at 10. But Nachampassack only makes a conclusory statement and does not explain how they constitute direct evidence. Confusingly, Nachampassack then contends that the Tollway's policy of issuing a 48-hour letter prior to separation "provides direct evidence where a reasonable fact-finder could conclude that Nachampassack's request for an accommodation caused the discharge." *Id*. Nachampassack's statement implies that she is now theorizing that her request for an accommodation in January 2017 caused the Tollway to retaliate against her and discharge her. But, this is not the retaliation claim Nachampassack alleges in her Complaint, which is premised on retaliation based on her participation in the Redding sexual harassment investigation. *See* Compl. ¶¶ 39–40. Moreover, Nachampassack stops there and does not explain how the Tollway's 48-hour letter policy constitutes direct evidence. Again, it is not the Court's role to construct legal arguments open to the parties. *See Vertex Refining*, 374 F. Supp. 3d at 765. Nachampassack provides no cogent argument as to how she has shown direct evidence supporting her retaliation claim.

## B. Circumstantial Evidence

The Court also finds that Nachampassack has failed to present sufficient circumstantial evidence that could permit an inference of retaliation based on her involvement in the Redding sexual harassment investigation. *See Robertson*, 949 F.3d at 379. First, no evidence suggests that Cataudella bore any animus toward

Nachampassack for her involvement in the Redding sexual harassment investigation. Cataudella has not communicated with Redding since his termination. Pl.'s Resp. DSOF ¶ 35. The Court is puzzled again by part of Nachampassack's argument, in which she states that she "has refuted Defendant's contention that Ms. Cataudella was a friend of Mr. Redding." Resp. at 11. But, the Tollway never states in its Statement of Facts that Cataudella was a friend with Redding. Nachampassack's suggestion that Cataudella took actions against her because Cataudella and Redding were friends is not supported by any admissible evidence. *See* Resp. at 12. The Court agrees with the Tollway that Nachampassack's claim that she saw a video of Cataudella and Redding drinking together is inadmissible under Federal Rule of Evidence 1002, that her statement that Redding told her he socialized with Cataudella is inadmissible hearsay under Federal Rule of Evidence 802, and that Bunting's testimony about rumors of a social relationship between Cataudella and Redding is also inadmissible hearsay under Rule 802. *Id.*; Reply at 7–8. The fact that Redding and Cataudella were at social events together (*see* Resp. at 12; Reply at 8) does not establish that Cataudella and Redding were friends. *See also* DSOF ¶ 35 (Cataudella viewed Redding as a work acquaintance, not as a friend). Regardless, it also does not support an inference that Cataudella had ill will towards Nachampassack and then retaliated against Nachampassack based on an alleged social relationship or friendship with Redding.

Nachampassack also presents evidence that Cataudella "blatantly ignored" Nachampassack's request to speak to her privately about Redding's harassment prior

to her termination. See Def.'s Resp. PSOAF ¶ 13. But this fact, on its own, is insufficient to support the causation element, however.

Nachampassack points to other evidence involving Cataudella but unrelated to Redding as purported circumstantial evidence. On June 13, 2016, Cataudella requested that Nachampassack be placed under "surveillance" while she was out. Def.'s Resp. PSOAF ¶ 14. But no evidence suggests that such surveillance ever occurred. Moreover, this fact alone proves nothing and Nachampassack fails to connect it to the Redding sexual harassment investigation. Nachampassack further distorts the facts by stating that Cataudella made Nachampassack's "leave a 'HIGH' level of importance in October 2016, and began the separation process of [Nachampassack's] employment as early as October 2016." Resp. at 11. The evidence simply does not support this oversimplified summary interpretation of the facts. Cataudella sent an email on October 6, 2016 to other Tollway employees with a "HIGH" level of importance stating that Nachampassack had been denied additional ALWOP. Def.'s Resp. PSOAF ¶ 17. On October 14, 2016, Cataudella e-mailed Wilson and O'Shea regarding beginning the separation process for Nachampassack. Def.'s Resp. PSOAF ¶ 18. According to the Tollway, Cataudella sent this email after being notified by Ferguson that Nachampassack had not submitted paperwork to support her request for an ADA accommodation and that Ferguson was closing her accommodation file. *Id.* But upon subsequent receipt of the appropriate documentation, the Tollway approved Nachampassack's request to extend her leave and did not in fact begin the separation process at that time. Pl.'s Resp. DSOF ¶ 46.

Further, Bunting never stated that she thought Nachampassack was being treated unfairly or differently than other Collectors. *See* Def.'s Resp. PSOAF ¶ 12. Moreover, Nachampassack does not connect her participation in the Redding sexual harassment investigation to these alleged retaliatory acts.

Finally, it is undisputed that Cataudella's direction to require Nachampassack to recertify her need for FMLA leave seven times occurred before Nachampassack complained about Redding's sexual harassment. Pl.'s Resp. DSOF ¶ 6. Therefore, the Court agrees with the Tollway that conduct that occurred *before* she complained about Redding's sexual harassment cannot be a basis for Nachampassack's retaliation claim. *See* MSJ Memo. at 10. The Court agrees with the Tollway that Nachampassack's allegations of harassment by Cataudella do not support an inference of retaliation.

Even though the Tollway also posits that Nachampassack cannot establish that Wilson bore any animus toward Nachampassack for her involvement in the Redding sexual harassment investigation (MSJ Memo. at 9–10), Nachampassack does not purport to argue that Wilson bore animus towards her as part of her attempt to establish the causal connection element for her retaliation claim.

The timing of the alleged retaliatory conduct directed against Nachampassack as it relates to when she complained about Redding's sexual harassment also does not support Nachampassack's position. "Suspicious timing is rarely enough to create a triable issue." *Miller*, 20 F.4th at 1156 (internal quotation and citation omitted). "For a suspicious-timing argument alone to give rise to an inference of causation, the

45

plaintiff must demonstrate that an adverse employment action follows close on the heels of protected expression, and the plaintiff must show that the person who decided to impose the adverse action knew of the protected conduct." *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 572 (7th Cir. 2021) (internal quotation and citation omitted). Curiously, Nachampassack only points to two retaliatory actions from which she asks the Court to make an inference based on timing: the June 2016 "surveillance" and the October 2016 "separation process." Resp. at 13. But she fails to explain how the timing of these events supports any inference the Court is supposed to make. The timing of these events is not important because, as indicated above, Nachampassack has failed to explain how these are adverse employment actions. And, as the Tollway highlights, it approved additional leave for Nachampassack on September 27, 2016, October 31, 2016 (after she submitted the appropriate paperwork from her doctor), and again on November 14, 2016, after both of these events occurred. Reply at 10. Similarly, Nachampassack also fails to develop any sort of cogent argument for the Court to make an inference based on timing as it relates to her ultimate termination from the Tollway in January 2017.

Finally, the Court addresses the evidence regarding other Tollway employees. True, the Tollway did not provide a 48-hour letter to Nachampassack, while it did provide such letters to three other employees. Def.'s Resp. PSOAF ¶ 34. The Tollway contends that it provided essentially the same information that would been in such a letter to Nachampassack, a fact which Nachampassack disputes. *See* DSOF ¶ 60. But, the parties agree that the purpose of the 48-hour letter is to inform the employee that

he or she must return to work within 48 hours, and if he or she does not, the Tollway would separate his or her employment. Pl.'s Resp. DSOF ¶ 59; Def.'s Resp. PSOAF ¶ 33. They also agree that on January 18, 2017, when Nachampassack asked Johnson if she could start the following week, Johnson responded that she could not and would be fired if she did not return to work. Def.'s Resp. PSOAF ¶ 23. And, in her conversation with Cataudella on the same day, Cataudella told Nachampassack that she could not return to work without a doctor's release. Pl.'s Resp. DSOF ¶ 54; Def.'s Resp. PSOAF ¶ 29. The parties dispute what else was said that day on the relevant phone calls. But the fact that Nachampassack was not provided a 48-hour letter before her separation does not lead the Court to make an inference of retaliation because Nachampassack does not make a causal link between this action and her involvement in the Redding sexual harassment investigation.

Nachampassack offers no admissible evidence to support her contention that a male Collector was off on ADA leave for 232 days in 2017 through 2018. *See* Resp. at 14. But it is undisputed that Tollway employee no. 012099 was off on ADA leave for 221 days, that Tollway employee no. 015082 was off through a combination of ALWOP and ULWOP for 201 days in 2016, and that Tollway employee No. 011452 was off through a combination of ALWOP and ULWOP for 137 days in 2016. *Id.*; Def.'s Resp. PSOAF ¶¶ 36–38.

The Tollway correctly emphasizes, though, that Nachampassack has presented no evidence showing how these similarly-situated employees were treated more favorably. Reply at 12–13 (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 723–24

47

(7th Cir. 218) (rejecting comparator evidence where plaintiff provided no context to permit the court to assess whether comparators were similarly situated to plaintiff)). Nachampassack has not shown how these other Tollway employees are similarly situated to her, both with respect to those who received 48-hour letters or those who had leave for more hundreds of days. In fact, she provides scant information on these other employees.

Nachampassack has failed to establish a *prima facie* case of Title VII retaliation (and Title VII wrongful termination) via direct or circumstantial evidence. As such, the Court need not address the parties' arguments relating to the Tollway's legitimate non-discriminatory reasons for its actions. *See Robertson*, 949 F.3d at 378.

## Conclusion

For the reasons given above, the Court grants the Tollway's motion for summary judgment. The Court enters summary judgment in favor of the Tollway and against Nachampassack on Counts I, II, and III. This civil case is terminated.

Dated: March 30, 2022

United States District Judge
Franklin U. Valderrama